## HARRY T. GIBBS *v.* STATE OF MARYLAND

[No. 690, September Term, 1972.]

*Decided July 3, 1973.*

232

The cause was argued before Morton, Moylan and Gilbert, JJ.

*Luther C. West* for appellant.

*Arrie W. Davis, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Mark Van Bavel, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellant, Harry T. Gibbs, was convicted in the Criminal Court of Baltimore by Judge Richard M. Pollitt, sitting without a jury, of two counts of armed robbery and one count of possession of a deadly weapon. Upon this appeal, he raises three contentions:

(1) That the trial judge abused his discretion in denying his motion for a continuance to produce a critical defense witness;

(2) That a .22 caliber Omega revolver, admitted into evidence against him, was unconstitutionally seized; and

(3) That the court did not have jurisdiction over the robberies.

We will consider first the search and seizure question.

On July 26, 1971, the Hilton House Bar, located at 3133 W. North Avenue in Baltimore City, was held up by three men at gunpoint. The barmaid, Daisy Porter, and a customer, James Fleming, were both robbed. Two witnesses to the robberies made in-court identifications of the appellant as one of the robbers. One other piece of incriminating evidence was a .22 caliber Omega revolver taken from the appellant by Officer Ronald Stewart on October 5, 1971, some ten weeks after the robbery. It was the seizure of that revolver which the appellant claims was unconstitutional.

The State candidly admits, as indeed it must, that there was no probable cause for Officer Stewart to arrest the appellant prior to searching him on October 5. The search, and subsequent seizure, palpably cannot qualify as "incidental to a lawful arrest." We are faced with the clean question of whether the police conduct on October 5 was

reasonable, and therefore constitutional, under the "stop and frisk" doctrine of *Terry v. Ohio*, 392 U. S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968), and *Sibron v. New York*, 392 U. S. 40, 88 S. Ct. 1889, 20 L.Ed.2d 917 (1968).*

On October 5, Officer Stewart was a member of the Control Staff Squad and operated in plain clothes. He described the area, of which the 3400 block of Virginia Avenue is a part, as "an area known to have a lot of assaults and robberies in the street, there's a lot of narcotics traffic in the area, there's a lot of crime, a high crime area." Officer Stewart testified that he saw the appellant and "one other Negro male about 11:30 that morning." He did not describe precisely where they were or anything at all about what they were doing. When asked whether he had made any other observations of the appellant and the other Negro male between that time and 3:45 p.m., he replied, "I saw them off and on up until the time I approached them." Again, no details of any sort were furnished. The critical confrontation came at 3:45 p.m. It was precipitated by Officer Stewart's observations of the appellant and two other men standing on the corner of the 3400 block Virginia Avenue. The officer was in plain clothes. He alighted from his unmarked vehicle and approached the three men. Two of them ran. Officer Stewart described his approach to the appellant in the following terms:

" . . . Mr. Gibbs, the Defendant, had his back turned toward me, he hadn't seen me approach. I approached, identified myself as a police officer. I asked Mr. Gibbs for his identification to see if he lived in this area.

Q. What, if anything, did Mr. Gibbs do?

A. Mr. Gibbs had no identification, and he didn't — he tried to run, but I grabbed his arm."

Officer Stewart then "frisked" the appellant and recovered

---

* The most thorough academic treatment of "stop and frisk" problems is found in LaFave, *"Street Encounters" and the Constitution: Terry, Sibron, Peters, and Beyond,* 67 Mich. L. Rev. 39 (1968).

the .22 caliber Omega revolver, fully loaded, from the appellant's hip pocket.

In *Terry*, the Supreme Court expressly recognized that it was attempting to strike a delicate balance between the necessity for some flexibility in permitted police behavior in the investigation and in the prevention of crime, on the one hand, and the rights of citizens to be free from unreasonable governmental intrusion, on the other hand.[1] The Supreme Court lucidly described the Scylla and the Charybdis between which it would attempt to chart its perilous course. It recognized first the practical needs of police routine:

" . . . [I]t is frequently argued that in dealing with the rapidly unfolding and often dangerous situations on city streets the police are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess. For this purpose it is urged that distinctions should be made between a 'stop' and an 'arrest' (or a 'seizure' of a person), and between a 'frisk' and a 'search.' Thus, it is argued, the police should be allowed to 'stop' a person and detain him briefly for questioning upon suspicion that he may be connected with criminal activity. Upon suspicion that the person may be armed, the police should have the power to 'frisk' him for weapons." 392 U. S. 10.

It juxtaposed the liberties of the citizens:

" . . . The heart of the Fourth Amendment, the argument runs, is a severe requirement of specific justification for any intrusion upon protected

---

1. "We would be less than candid if we did not acknowledge that this question thrusts to the fore difficult and troublesome issues regarding a sensitive area of police activity — issues which have never before been squarely presented to this Court. Reflective of the tensions involved are the practical and constitutional arguments pressed with great vigor on both sides of the public debate over the power of the police to 'stop and frisk' — as it is sometimes euphemistically termed — suspicious persons." 392 U.S. 9-10.

personal security, coupled with a highly developed system of judicial controls to enforce upon the agents of the State the commands of the Constitution. Acquiescence by the courts in the compulsion inherent in the field interrogation practices at issue here, it is urged, would constitute an abdication of judicial control over, and indeed an encouragement of, substantial interference with liberty and personal security by police officers whose judgment is necessarily colored by their primary involvement in 'the often competitive enterprise of ferreting out crime.' . . . This, it is argued, can only serve to exacerbate police-community tensions in the crowded centers of our Nation's cities." 392 U. S. 11-12.

*Terry* rejected the notion that the "stop" — even though falling short of the "technical arrest" — and the "frisk" — even though something less than a "full-blown search" — do not come within the purview of the Fourth Amendment.[2] It made it clear that the "stop" is a seizure of the person within the contemplation of the Fourth Amendment:

> "It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime — 'arrests' in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." 392 U. S. 16.

*Terry* made it equally clear that the "frisk" is a search within the contemplation of the Fourth Amendment:

> "And it is nothing less than sheer torture of the English language to suggest that a careful

---

2. "There is *some suggestion* in the use of such terms as 'stop' and 'frisk' that such police conduct is outside the purview of the Fourth Amendment because neither action rises to the level of a 'search' or 'seizure' within the meaning of the Constitution. We emphatically reject this notion." 392 U. S. 16.

exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is not a 'search.' Moreover, it is simply fantastic to urge that such a procedure performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a 'petty indignity.' It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." 392 U. S. 16-17.

The Supreme Court went on to recognize, however, that because the "stop" is more limited in scope than an arrest and because the "frisk" is more limited in scope than the full-blown search, such actions, though not to be undertaken arbitrarily, may be reasonable within the contemplation of the Fourth Amendment upon a predicate less substantial than "probable cause." *Terry* made it clear that "stop and frisk" rationale was to be judged not by the Warrant Clause of the Fourth Amendment, but rather by the Reasonableness Clause. It said, at 392 U. S. 20:

"If this case involved police conduct subject to the Warrant Clause of the Fourth Amendment, we would have to ascertain whether 'probable cause' existed to justify the search and seizure which took place. However, that is not the case. . . . [W]e deal here with an entire rubric of police conduct — necessarily swift action predicated upon the on-the-spot observations of the officer on the beat — which historically has not been, and as a practical matter could not be, subjected to the warrant procedure. Instead, the conduct involved in this case must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures."

The quantitative measure of reasonableness is variously labeled — "suspicion," "reasonable suspicion," "reason to believe." *Terry* makes it very plain, however, that the officer

is not entitled to act on "his inchoate and unparticularized suspicion or 'hunch'" but only on "the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." 392 U. S. 27. *Terry* insists that at some point it must be insured that "the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances." The requirement is clear that although the policeman may act upon less than probable cause, he must be able to articulate specific facts justifying each intrusion:

> "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. ... Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction. ... And simple 'good faith on the part of the arresting officer is not enough'." 392 U. S. 21-22.

It is furthermore clear that the policeman must be able to articulate specific facts justifying both the "stop" and, quite independently, the "frisk." The latter does not follow inexorably from the former. *Terry* points out very emphatically that different governmental interests are involved in "stops," on the one hand, and "frisks," on the other hand. Although a reasonable "stop" is a necessary predecessor to a reasonable "frisk," [3] a reasonable "frisk"

---

3. "In the first place, if the frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a *forcible* stop. Any person, including a policeman, is at liberty to avoid a person he considers dangerous. If and when a policeman has a right instead to disarm such a person for his own protection, he must first have a right not to avoid him but to be in his presence. That right must be more than the liberty (again, possessed by every citizen) to address questions to other persons,

does not inevitably follow in the wake of every reasonable "stop."

The dichotomy is evident in both *Terry* and *Sibron*. In *Sibron*, the Court did not resolve the question of whether the initial "stop" was or was not reasonable because of its belief that, in any case, the follow-up "frisk" was unreasonable. In *Terry*, it was assumed, virtually from the outset, that the "stop" was reasonable. The nub of the case was whether the follow-up "frisk" had also a reasonable predicate. The Court made the transition very marked when it passed from the consideration of the first question to the distinct consideration of the second question:

> "The crux of this case, however, is not the propriety of Officer McFadden's taking steps to investigate petitioner's suspicious behavior, but rather, whether there was justification for McFadden's invasion of Terry's personal security by searching him for weapons in the course of that investigation." 392 U. S. 23.

### The Stop

The governmental interest which permits a limited restraint upon a citizen's freedom — something more than a mere accosting but less than a formal arrest — is that of preventing and detecting crime. This is the interest served by the "stop." Of it, *Terry* said, at 392 U. S. 22:

> "[W]e consider first the nature and extent of the governmental interests involved. One general interest is of course that of effective crime prevention and detection; it is this interest which underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of

for ordinarily the person addressed has an equal right to ignore his interrogator and walk away; he certainly need not submit to a frisk for the questioner's protection. I would make it perfectly clear that the right to frisk in this case depends upon the reasonableness of a forcible stop to investigate a suspected crime." 392 U. S. 32-33 (concurring opinion by Harlan, J.).

investigating possibly criminal behavior even though there is no probable cause to make an arrest."

*Terry* and *Sibron* provide suitable bench marks against which to measure the case at bar. In *Terry*, the observing officer noticed Terry and a companion standing on a corner. First Terry, and then his companion, would walk along a block of storefronts, pausing to look into a particular store, then walking on, then turning about and retracing his steps, then looking a second time into the same store, and then rejoining his companion at the corner. Between the two men, approximately a dozen of such trips were made. A third man joined them briefly, then walked off, and then rejoined them. The officer articulated that he suspected the men of "casing a job," "a stickup."

The conduct at bar does not remotely approach that which in *Terry* gave rise to a reasonable "stop." There was no conduct which could be called suspicious. The appellant was just hanging around a neighborhood from late morning through mid-afternoon. Indeed, the conduct was more innocuous than that observed in *Sibron*. The observing officer there kept Sibron under surveillance from 4 p.m. until midnight. He observed him in conversation with six or eight persons whom he knew to be narcotics addicts. Shortly before the ultimate "stop," the officer observed Sibron in a restaurant with three more known addicts. Although the majority opinion did not squarely reach the point of whether the "stop" in *Sibron* was or was not reasonable, Justice Harlan in his concurring opinion was convinced that it was not:

"The forcible encounter between Officer Martin and Sibron did not meet the *Terry* reasonableness standard. In the first place, although association with known criminals may, I think, properly be a factor contributing to the suspiciousness of circumstances, it does not, entirely by itself, create suspicion adequate to support a stop. There must be something at least in the activities of the person

being observed or in his surroundings that affirmatively suggests particular criminal activity, completed, current, or intended." 392 U. S. 73 (concurring opinion by Harlan, J.).

Officer Stewart, in the case at bar, articulated absolutely nothing as to what crime or type of crime he reasonably suspected the appellant of having engaged in, of then engaging in, or of being about to engage in. It is neither criminal nor quasi-criminal to stand around or to loaf about on a street corner, particularly in broad daylight. Officer Stewart's predicate for the "stop" was palpably "nothing more substantial than [an] inarticulate hunch" or "his inchoate and unparticularized suspicion," condemned by *Terry* as inadequate. The "stop" was unreasonable under the Fourth Amendment.

### The Frisk

Even if, however, the "stop" could be deemed reasonable, for the sake of argument, the "frisk" in this case would still be unreasonable.

Even after a reasonable "stop" has been made, the governmental interest which permits the further intrusion of a limited search — a "frisk" — of the person is not the prevention or the detection of crime, but rather the protection of the officer making the "stop." This interest was delineated in *Terry*, at 392 U. S. 23-24:

"We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. . . .

. . . When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the

officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm."

In the service of this governmental end, there is still a need for articulation. *Terry* stresses the "reasonable apprehension of danger" where the officer "has reason to believe that he is dealing with an armed and dangerous individual." *Terry* points out, at 392 U. S. 27:

"The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. . . . And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."

*Terry*, in which the "frisk" was held reasonable, and *Sibron*, in which the "frisk" was held unreasonable, narrow the focus on the point of "reasonable apprehension." The Supreme Court pointed out that the observing officer's articulated "hypothesis" in *Terry* was "that these men were contemplating a daylight robbery — which, it is reasonable to assume, would be likely to involve the use of weapons." With all indications pointing to armed robbery, the officer was held to have "observed enough to make it quite reasonable to fear that they were armed." [4]

Contrasting with the situation in *Terry* is that in *Sibron*. The officer, in that case, never testified that he feared that

---

4. We dealt with a similar situation in *Williams v. State*, 7 Md. App. 204, 253 A. 2d 786, wherein we held that a "frisk" or protective search was perfectly reasonable where the stopping officer was looking for an individual who minutes before had shot a fellow policeman and had fled the scene, still armed.

Sibron was armed or that he acted to protect himself from danger. The Supreme Court stressed that the officer "never at any time put forth the notion that he acted to protect himself." 392 U. S. 64, n. 21. The Court pointed out that a reasonable "frisk" does not follow inevitably in the wake of every reasonable "stop," but requires specific justification. The Court said, at 392 U. S. 64:

> "The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous. *Terry v. Ohio, supra.* Patrolman Martin's testimony reveals no such facts. The suspect's mere act of talking with a number of known narcotics addicts over an eight-hour period no more gives rise to reasonable fear of life or limb on the part of the police officer than it justifies an arrest for committing a crime. Nor did Patrolman Martin urge that when Sibron put his hand in his pocket, he feared that he was going for a weapon and acted in self-defense."

Justice Harlan, in his concurring opinion in *Sibron*, contrasted the essentially "automatic" right to "frisk" where the crime suspected is one of violence, with the concomitant likelihood that the suspect is armed, with the situation in *Sibron* where no such conclusion automatically follows:

> "[A]lthough I think that, as in *Terry*, the right to frisk is automatic when an officer lawfully stops a person suspected of a crime whose nature creates a substantial likelihood that he is armed, it is not clear that suspected possession of narcotics falls into this category. If the nature of the suspected offense creates no reasonable apprehension for the

officer's safety, I would not permit him to frisk unless other circumstances did so." 392 U. S. 74.

A reasonable predicate for the "frisk" at bar is lacking under *Sibron.* Officer Stewart's confrontation with the appellant was on a public street in broad daylight. The officer was not surrounded by a hostile group. The officer did not suspect the appellant of any specific crime, let alone one which would have implied the use of a deadly weapon. The officer simply described the area as a "high crime area," but indicated that narcotics violations were a part of the crime in the area. *Sibron* pointed out that even had a narcotics violation been reasonably suspected, that would not have implied the possession of a deadly weapon. More significantly, Officer Stewart never testified that he feared that the appellant might be armed or that he acted out of self-protection. Although only reasonable suspicion and not probable cause is required to justify a "frisk," in the case at bar no predicate at all was established, whatever its quantitative measure.

Because of the unconstitutional seizure of the revolver, the conviction for the possession of that revolver must be reversed. With respect to the robbery convictions, however, we believe that the erroneous admission of the revolver in evidence was harmless error. The revolver was not identified by the robbery victims as the weapon with which they were held up. The only nexus between it and the robberies was that it was a gun and the robberies were committed with a gun. Its inculpatory value as to the robbery charges was minimal, if anything at all. The trial court did not refer to it in reaching its findings of guilt on the robbery charges. Indeed, the judge made it clear that he was relying upon the identifications made by two eyewitnesses, which he characterized as "positive." Under the circumstances, we are convinced, beyond a reasonable doubt, that the introduction of the gun did not contribute to the verdicts on the robbery charges. *Chapman v. California,* 386 U. S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967).

The appellant claims that the trial judge abused his

discretion in denying him a continuance to produce a defense witness. He indicated that the witness was one Dennis Hayes. He proffered that Dennis Hayes, then incarcerated in Hagerstown, had confessed and pleaded guilty to being one of the two participants in the holdup. According to the proffer, Hayes would testify that the appellant did not participate in the robbery. We note initially that this contention involves not the Sixth Amendment right to summons witnesses in one's defense, but rather the question of whether a continuance should have been granted. Such decisions are left to the discretion of the trial judge and will only be reversed where there is a clear showing that discretion was abused. *Hainesworth v. State*, 9 Md. App. 31, 262 A. 2d 328. We are not persuaded that there was an abuse of discretion at bar.

This was, of course, a case where the judge was sitting as the fact finder. He accepted the proffer of what Hayes's testimony would be. He indicated that Hayes's conviction as an armed robber would erode to some extent his credibility. He indicated that because of his firm belief in the positive identification made by two eyewitnesses, his judgment would not be changed by Hayes's testimony.

We note, moreover, that the appellant had made no effort whatsoever to issue a summons for Hayes. The trial had been set for July 10 before it was postponed to the actual trial date of August 21, 1972. The appellant attempts to explain his failure to summons this defense witness by claiming that he thought that the robbery charges against him had been dismissed. He relies exclusively upon the fact that on February 16, 1972, a white card arrived at the jail from the Clerk's Office of the Criminal Court indicating that the robbery charges had been dismissed. The State quickly explained what had happened. After his initial appearance in the District Court, the appellant was "specialed" to the Grand Jury by the State's Attorney's Office. That means that they moved with great expedition to take his case before the Grand Jury, without waiting for the routine administrative mills to grind. The Grand Jury had already indicted the appellant when, days later, the regular papers,

now duplicitous, came up routinely from the District Court. These now redundant charges were, indeed, dismissed so that there would not be duplicate charges on the books against the appellant. Whatever doubt the appellant may have had would certainly have been resolved when he signed a receipt on March 13, 1972, for the receipt of copies of all indictments pending against him, including the indictments charging robbery. Having met with and conferred with his attorney in preparation for trial first on July 10 and then finally on August 21, the appellant does not persuade us that he was ignorant of the fact that he was about to go on trial for robbery. The assertion smacks of opportunism. He had every opportunity to summons any witness he wished and did not avail himself of that opportunity. We see no abuse of discretion in denying the continuance.

The appellant's final contention gives us little pause. He now claims that the trial court had no jurisdiction over the offenses because there was no showing that the crimes occurred anywhere in the State of Maryland, let alone in Baltimore City. At no time, prior to trial or during the trial, did the appellant advance this claim. He did not move for a judgment of acquittal at the close of the State's case. He did so in a few words at the close of the entire case, but made no issue of either venue or jurisdiction. The indictment to which he pleaded did, indeed, allege that crimes had occurred in the City of Baltimore, in the State of Maryland.

Testimony adduced that the site of the robberies was the Hilton House Tavern located at 3133 W. North Avenue. Three witnesses were called by the State to testify as to the robberies that occurred in that tavern. Daisy Porter gave her address as 3120 W. North Avenue and then indicated that she was employed at the Hilton House Tavern. Raymond Presley gave his address as 2329 Wesley Avenue and then indicated that he was familiar with the location of the Hilton House Tavern and had been there on the evening of July 26, 1971. James Kelly Fleming gave his address as 29 N. Abington Avenue and then indicated his familiarity with "the Hilton House Tavern at 3133 W. North Avenue." With respect to venue in Baltimore City, the appellant's pleading

to the charge waived any objection he might have had to ostensibly improper venue. *Cole v. State*, 232 Md. 111, 194 A. 2d 278. With respect to jurisdiction, we think from all of the facts and circumstances of the case, the inference is clearly permissible that the Hilton House Tavern at 3133 W. North Avenue is in the State of Maryland. The holding in *Iozzi v. State*, 224 Md. 42, 166 A. 2d 257, is pertinent here:

> "Moreover, it is generally held that geographical facts of a local nature may be judicially noticed by a trial court to establish venue. . . . This is particularly true as to the location of towns within a particular county where the court sits. We think the trial court could properly take judicial notice that the town of Arbutus is within the territorial limits of Baltimore County." 242 Md. at 44.

The appellant reads *Dean v. State*, 205 Md. 274, 107 A. 2d 88, as holding that only a *local* judge may take judicial notice of local geography. He points out that Judge Pollitt is an Eastern Shoreman who was on temporary judicial duty in Baltimore. We do not read the reference to "local judge" in *Dean* as establishing a *sine qua non*. In opinion writing as in trial advocacy, all supporting details are marshaled to make each specific position as unassailable as possible. Every descriptive reference to supporting details, fortifying the soundness of a particular application of a legal principle to a given factual situation, must not be read as setting out the irreducible minimum or indispensable conditions of the principle itself.

> *Judgment on indictment charging possession of a deadly weapon reversed; judgments on the robbery indictments affirmed.*