REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0534

September Term, 2016

_____

BRANDON AMES

v.

STATE OF MARYLAND

_____

Graeff,
Kehoe,
Moylan, Charles E., Jr.,
      (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed:  February 3, 2017

In 1968 the Supreme Court, in <u>Terry v. Ohio</u>, 392 U.S. 1, 88 S.Ct. 1878, 20 L.Ed.2d 889, extended to the police a broad new investigative prerogative, along with a concomitant self-protective measure, permitting for the first time official intrusion into the privacy of citizens on predicates less substantial than probable cause. Recognizing the potential for abuse of the new prerogatives, the Supreme Court sought to keep them under tight control by circumscribing them with austere limitations. With the passage of 49 years, however, the police inevitably still embrace the prerogatives enthusiastically but are increasingly less than vigilant in observing the limitations. The specimen of this tendency now on the table for examination is a <u>Terry</u> frisk.

The appellant, Brandon Ames, was convicted by a Wicomico County jury of the possession of a fake controlled dangerous substance with intent to distribute, the possession of heroin, and the possession of drug paraphernalia. On appeal, he raises the single contention that his pre-trial motion to suppress the physical evidence was erroneously denied.

## The Handwriting on the Wall

In denying the motion to suppress the physical evidence, the suppression hearing judge was ominously prophetic:

> "<u>It's very thin</u>, … and <u>Ms. Bell is making some real good arguments that may hold up on appeal</u>[.] [But] with all of these facts coupled together under the totality of the circumstances, I don't think it was an unreasonable search and seizure. I'm going to deny your motion to suppress.
>
> "But <u>I commend you for a good argument</u>, and <u>I think maybe an Appellate Court should parse this out</u>, because <u>there is … caselaw [that] is kind of contradictory</u>, and <u>this is a close one</u> on the facts."

(Emphasis supplied). *Mene. Mene*. The handwriting was on the wall.

## The Constitutional Tilt Against Warrantless Activity

As we undertake our analysis, the constitutional starting point is clear. As this Court pointed out in State v. Mason, 173 Md. App. 414, 429, 919 A.2d 752 (2007):

> "We must never lose sight of our starting point that warrantless searches and seizures, including the ongoing seizure of a person at the curbside, are presumptively unreasonable and that the burden is on the State to rebut that presumption and persuade the suppression hearing judge otherwise."

## An Anonymous Phone Call and Its Aftermath

The State's case is, indeed, thin in many respects. The single witness at the suppression hearing was Delmar Police Officer Nicholas Aungst. On September 18, 2015, at 4:23 p.m., Officer Aungst received an anonymous telephone call from someone who "refused to give their name." The caller said that a black man "wearing dark grey sweatpants and a Chicago Bulls hat" was standing in front of "the 700 building of Chestnut Manor" with a gun in the waistband on his pants. There was no description of the man's height or weight, his hairstyle, his shirt, or his shoes.

Officer Aungst responded to the Chestnut Manor Apartments but did not see anyone matching the description. He continued with his regular patrol duties. At 4:45 p.m., Officer Aungst received a call from Dispatch providing the "exact description" he had earlier received directly, of a black man wearing sweatpants and a Chicago Bulls hat "in front again with a gun in his waistband." We note at this point that the second call added nothing to the first call in terms of our Fourth Amendment analysis. There was no identification of the source of Dispatch's information. The anonymous caller may have called back a second

2

time. Dispatch, on the other hand, may simply have sent out the message that had earlier been received. Our analysis will be based upon the police receipt of a presumptively single anonymous message.

After that call from Dispatch, Officer Aungst returned to the apartment complex. On this occasion, he saw the appellant, a black man wearing gray sweatpants and a Chicago Bulls hat. The appellant was "leaning up against the building" in the entranceway of the 700 block of Chestnut Manor. The appellant's hands were visible and empty. He did not throw anything, nor did he attempt to flee as the officer approached. Officer Aungst began questioning the appellant. We will give the officer the benefit of the doubt and characterize that questioning as a mere accosting. Officer Aungst stated that the appellant "seemed very nervous." At the suppression hearing he testified:

> "I asked [the appellant] if he had anything on him that I needed to worry about. He said no and started shaking."

The appellant denied having a weapon, but the officer noted that he "kept touching his left front pocket," which the officer interpreted as an "involuntary response" to contraband in his pockets. According to the officer, the appellant made no threatening gestures. Although we will elaborate on this more fully infra, we note that there is no such Constitutionally sanctioned procedure as a Terry frisk as an adjunct to a mere accosting.

**An Immediate Escalation to the Terry Level**

At that point, which we designate as the critical point for analysis, Officer Aungst shifted the encounter into operational Fourth Amendment gear. He subjected the appellant to a Terry frisk by executing an "open-hand pat-down of [the appellant's] outer garments."

3

In the course of the frisk, Officer Aungst felt nothing in the appellant's waistband but did detect a soft "large bulge" in the appellant's left front pants pocket. The officer asked, "What is this?" The appellant "didn't answer … at first and just started shaking." The officer asked, "Is there anything in here that can hurt me?" The appellant responded, "Yes, I do have needles." The officer reached into the appellant's pocket and removed an opaque coin purse." Inside the purse, the officer found "a plastic bag containing … a hard rock-like substance" that "resembled crack cocaine." He also found other bags, some containing a white powdery substance, plus a spoon and two needles. There obviously had been a significant Fourth Amendment intrusion. The single issue on appeal is whether that intrusion was justified.

## Assessing an Anonymous Informant's Reliability

The initial scenario in this case is virtually indistinguishable from that before the Supreme Court in Florida v. J.L., 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). The gist of the tip in this case is that the appellant had a gun in his waistband. Such was the issue, 529 U.S. at 268, in Florida v. J.L.

> "The question presented in this case is whether an anonymous tip that a person is carrying a gun is, without more, sufficient to justify a police officer's stop and frisk of that person. We hold that it is not."

(Emphasis supplied).

Even as in the present case, the anonymous tip in Florida v. J.L. identified a place, described the suspect's clothing, and alleged that the suspect was carrying a gun.

> "On October 13, 1995, an anonymous caller reported to the Miami–Dade Police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun…. [N]othing is known about the

4

informant. Sometime after the police received the tip—the record does not say how long—two officers were instructed to respond. <u>They arrived at the bus stop</u> about six minutes later <u>and saw three black males</u> "just hanging out [there]." <u>One of the three</u>, respondent J.L., <u>was wearing a plaid shirt</u>. Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct. <u>The officers did not see a firearm, and J.L. made no threatening or otherwise unusual movements. One of the officers</u> approached J.L., told him to put his hands up on the bus stop, <u>frisked him, and seized a gun</u> from J.L.'s pocket."

529 U.S. at 268. (Emphasis supplied).

The Supreme Court recognized at the outset, 529 U.S. at 270, the general unreliability of an anonymous informant.

"Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, <u>an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity</u>."

(Emphasis supplied; internal citations and quotations omitted).

The Court hastened to add, however, that even an anonymous tip may be sufficiently corroborated, by independent police verification of some of the information supplied by the informant, to justify reliance, at least to the level of <u>Terry v. Ohio</u>'s reasonable suspicion standard.

"As we have recognized, however, there are situations in which <u>an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop</u>. The question we here confront is whether the tip pointing to J.L. had those indicia of reliability."

529 U.S. at 270. (Emphasis supplied; quotations omitted).

The very low level of independent police verification available in Florida v. J.L., however, was inadequate to raise the anonymous telephone tip to Terry's constitutional standard. Absent such bolstering, the tip could not justify interfering with a citizen's rights.

> "All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L."

529 U.S. at 271.

The inadequacy of the independent police verification in Florida v. J.L. does not bode well for almost precisely the same independent police verification in the case now before us.

> "Florida contends that the tip was reliable because its description of the suspect's visible attributes proved accurate: There really was a young black male wearing a plaid shirt at the bus stop."

(Emphasis supplied).

The tip there was about a young black male. The tip here was about a young black male. The tip there described his clothing. The tip here described his clothing. The tip there had the suspect standing in front of a bus stop. The tip here had the suspect standing in front of a building. The tip there alleged the possession of a gun. The tip here alleged the possession of a gun. In both cases, the independent police investigation confirmed that a young black male was, indeed, wearing the previously described clothing at the previously described location. In each case, everything was corroborated except the possession of the gun. The Supreme Court explained, 529 U.S. at 272, why the tip in that case failed to pass constitutional muster.

6

"An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: <u>It will help the police correctly identify the person whom the tipster means to accuse</u>. <u>Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity</u>. The <u>reasonable suspicion</u> here at issue <u>requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person</u>."

(Emphasis supplied).

The absence of corroboration of the anonymous telephone tip in <u>Florida v. J.L.</u> (as well as in the present case) contrasts sharply with the massive independent police verification corroborating an anonymous telephone tip in <u>Alabama v. White</u>, 496 U.S. 325, 110 S. Ct. 2412, 110 L.Ed.2d 301 (1990). The tipster in <u>Alabama v. White</u> was able to predict the suspect's future activity of a type that only an insider would know. As the police watched, the predicted activities came to pass, as the tip, step by step, ripened into reliability.

"We think it also important that, '<u>the anonymous [tip] contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions</u> of third parties <u>ordinarily not easily predicted</u>.' The fact that the officers found a car precisely matching the caller's description in front of the building is an example of the former. Anyone could have 'predicted' that fact because it was a condition presumably existing at the time of the call. <u>What was important was the caller's ability to predict respondent's future behavior, because it demonstrated inside information – a special familiarity with respondent's affairs</u>. The general public would have had no way of knowing that respondent would shortly leave the building, get in the described car, and drive the most direct route to Dobey's Motel. Because only a small number of people are generally privy to an individual's itinerary, <u>it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities</u>. When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop."

496 U.S. at 332. (Emphasis supplied).

There was, of course, no such massive corroboration of predicted behavior in Florida v. J.L. and no such massive corroboration in the case now before us. Even Alabama v. White, with its massive corroboration, was modest about its own adequacy: "it is a close case." Id. The bare-bones anonymous telephone tip in the present case, with no significant independent police verification, failed to establish the reasonable suspicion that a crime had occurred, was then occurring, or was about to occur necessary to justify a Terry stop or the reasonable suspicion that the appellant was armed and dangerous necessary to justify a Terry frisk.

## A Terry Stop

This is exclusively a Terry frisk case and not a Terry stop case, and the two do not conflate. A brief word about Terry stops is desirable, nonetheless, simply to provide the necessary context for an analysis that looks to the relationship between a stop and a frisk. The Terry stop and the Terry frisk, of course, serve quite distinct purposes. The stop is crime-related, its purpose being to prevent or to detect crime. The reasonable articulable suspicion for a stop must be framed in terms of that purpose. The frisk, by diametric contrast, is not intended to be an investigative tool at all. Its express purpose and animating concern is the safeguarding of the life and limb of the stopping officer. In Graham v. State, 146 Md. App. 327, 358-59, 807 A.2d 75 (2002), we stressed this difference in purposes:

> "The respective interests served by stops and by frisks are distinct. The stop is crime-related. What is, therefore, required is reasonable suspicion that a crime has occurred, is then occurring, or is about to occur. The frisk, by contrast, is concerned only with officer safety. What is, therefore, required

is a reasonable articulable suspicion that the person stopped is armed and dangerous."

(Emphasis supplied). In Gibbs v. State, 18 Md. App. 230, 241, 306 A.2d 587 (1973), this Court had earlier pointed out that the purpose of a Terry frisk was not to prevent or to detect crime.

> "Even after a reasonable 'stop' has been made, the governmental interest which permits the further intrusion of a limited search – a 'frisk' – of the person is not the prevention or the detection of crime, but rather the protection of the officer making the 'stop.'"

(Emphasis supplied).

Terry v. Ohio itself, 392 U.S. at 23, made the distinction in purpose absolutely clear.

> "We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him…."

(Emphasis supplied). As a result, the Terry stop and the Terry frisk each require separate justification. As was stated in Alfred v. State, 61 Md. App. 647, 664, 487 A.2d 1228 (1985):

> "Even if the stop had been legitimate, that would not imply the legitimacy of the frisk. As a distinct intrusion, the frisk requires its own independent justification."

(Emphasis supplied).

The distinct requirements were fully articulated in Gibbs v. State, 18 Md. App. at 238-39:

> "It is furthermore clear that the policeman must be able to articulate specific facts justifying both the 'stop' and, quite independently, the 'frisk.' The latter does not follow inexorably from the former. Terry points out very emphatically that different governmental interests are involved in 'stops,' on the one hand, and 'frisks,' on the other hand. Although a reasonable 'stop' is

9

> a necessary predecessor to a reasonable 'frisk,' a reasonable 'frisk' does not inevitably follow in the wake of every reasonable 'stop.'"

(Emphasis supplied).

In the present case, there was no <u>Terry</u> stop. At the suppression hearing, the State did not attempt to establish a <u>Terry</u> stop. Before us, the State does not contend that there was an antecedent <u>Terry</u> stop. As he was asking questions of the appellant, Officer Aungst went immediately for a <u>Terry</u> frisk. It was as if Officer Aungst considered a <u>Terry</u> frisk to be a permissible adjunct to a mere accosting.

Even if, purely <u>arguendo</u>, there had been an antecedent <u>Terry</u> stop, however, it is clear from everything we have said about the anonymous telephone tip and the essentially insignificant police observation that followed it, that there was no reasonable articulable suspicion to justify a <u>Terry</u> stop. The ostensible <u>Terry</u> frisk is on its own.

## The <u>Terry</u> Frisk

The ostensible <u>Terry</u> frisk, which was the lone rationale for the State's seizure of the physical evidence in this case, failed abjectly to pass constitutional muster in three separate ways, any one of which would be fatal.

**A.    The Lack of Reasonable Suspicion That the Stopee Was Armed and Dangerous.**

The purpose for a <u>Terry</u> stop and the purpose for a <u>Terry</u> frisk are, as we have stated, very different. The <u>Terry</u> stop is part of law enforcement's arsenal in its war on crimes. In the words of <u>Terry v. Ohio</u> itself, 392 U.S. at 22,

> "[W]e consider first the nature and extent of the governmental interests involved. One general interest is of course that of <u>effective crime prevention and detection</u>; it is this interest which underlies the recognition that a police

10

officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest."

(Emphasis supplied). And see, Gibbs v. State, 18 Md. App. at 239-40.

The purpose of the Terry frisk, by diametric contrast, is not directly crime-related at all but is exclusively concerned with officer safety, with safeguarding the life and limb of the officer who is thrust into the potentially dangerous situation of conducting a Terry stop, perhaps in a darkened alley and perhaps at three o'clock in the morning. Terry addressed, 392 U.S. at 28-24, the distinct purpose of the Terry frisk:

> "We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him."

(Emphasis supplied). See also Gibbs v. State, 18 Md. App. at 241; Alfred v. State, 61 Md. App. 647, 666, 487 A.2d 1228 (1985).

Before we even turn to the qualitative assessment of the rationale being urged as a justification for the Terry frisk, there is first the threshold requirement that the frisking officer articulate his specific reasons for believing that the suspect was armed and dangerous. It is not enough that objective circumstances be present that might have permitted some other officer in some other case to conclude that the suspect was armed and dangerous. It is required that the frisking officer himself expressly articulate the specific reasons he had for believing that the frisk was necessary. In Graham v. State, 146 Md. App. 327, 359, 807 A.2d 75 (2002), this Court spoke of the articulation requirement:

11

> "One of the key requirements of reasonable suspicion, for either a stop or a frisk, is not only that it be present but that it be actually articulated. For a good frisk, it is not enough that in the abstract facts have been developed that might, objectively, permit some officer somewhere to conclude that the suspect or stoppee was armed and dangerous. It is required that the frisking officer actually articulate the factors that lead to his reasonable suspicion that a frisk was necessary for his own protection."

(Emphasis supplied).

The companion case to Terry v. Ohio was Sibron v. New York, 392 U.S 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). The stopping officer in Sibron lunged for Sibron's shirt pocket from which he recovered drugs. The State contended that when Sibron himself moved toward his shirt pocket, that could have justified the officer in believing that a weapon might be there.[1] The Supreme Court reminded the State that the officer failed to articulate any such reasons and gave instead a different reason that failed to mention a fear of a weapon:

> "In the case of the self-protective search for weapons, [the officer] must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous. Patrolman Martin's testimony reveals no such facts. The suspect's mere act of talking with a number of known narcotics addicts over an eight-hour period no more gives rise to reasonable fear of life or limb on the part of the police officer than it justifies an arrest for committing a crime. Nor did Patrolman Martin urge that when Sibron put his hand in his pocket, he feared that he was going for a weapon and acted in self-defense."

---

[1] The leading question of the Assistant District Attorney strove desperately to keep Patrolman Martin on message. "You had reason at that point, I assume, to fear that Sibron was going for his gun?" The "savvy" patrolman, however, abjured so wimpish an apprehension. "Naw. I knew that was where he kept his stash." Factually, the stage had been set, but the patrolman failed to articulate the necessary message. That failure to articulate was dispositive.

392 U.S. at 64. (Emphasis supplied). See also, <u>Gibbs v. State</u>, 18 Md. App. at 242 ("In the service of this governmental end [a <u>Terry</u> frisk for weapons], there is still a need for articulation."); <u>Alfred v. State</u>, 61 Md. App. at 665 ("If in the present case the police had any reason to suspect that the Appellant and Alexander were armed, <u>they failed utterly to articulate those reasons</u>." (Emphasis supplied)); <u>Whitehead v. State</u>, 116 Md. App. 497, 508, 698 A.2d 1115 (1997) ("In this case, Trooper Donovan, … <u>did not articulate</u> that he wished to conduct a search to protect himself." (Emphasis supplied).).

Although the <u>Terry</u> stop and the <u>Terry</u> frisk each serves a different purpose, the constitutional requirement of reasonable articulable suspicion is precisely the same in both cases. Reasonable suspicion for a <u>Terry</u> stop and reasonable suspicion for a <u>Terry</u> frisk must rise to precisely the same level in each of the respective test tubes. Based on the Supreme Court opinion in <u>Florida v. J.L.</u>, we have, <u>supra</u>, analyzed at length why an anonymous and essentially uncorroborated telephone tip did not establish reasonable articulable particularized and individualized suspicion to justify a <u>Terry</u> stop. For precisely the same reasons, it could not justify a <u>Terry</u> frisk. In either test tube, it lacked the necessary reliability.

## B.    The Absence of an Antecedent <u>Terry</u> Stop.

A <u>Terry</u> frisk is neither a self-contained nor free-standing police prerogative. It has no life of its own. Just as a search incident is no more than an adjunct to a lawful arrest and does not exist outside the universe of the lawful arrest, so too is a <u>Terry</u> frisk a mere adjunct of a <u>Terry</u> stop that does not exist outside the universe of the <u>Terry</u> stop. A <u>Terry</u> stop is an indispensable prerequisite to a <u>Terry</u> frisk. It is also true, moreover, that the required

13

antecedent <u>Terry</u> stop be a Constitutionally reasonable stop, and not a mere flawed attempt at one. A vigilant officer may not observe the passing parade of life go by, develop reasonable <u>Terry</u>-level suspicion that certain members of the passing parade are armed, and presume to frisk them. It is only when duty requires an officer to go in harm's way that the additional protection becomes necessary. Short of that point, the officer is adequately protected simply by staying out of harm's way. The police cannot, in a word, get to Beta without passing through Alpha.

The reason for this limitation on police behavior is that ordinarily the Constitution does not permit, by way of search or seizure, a police intrusion on the privacy of a citizen on a predicate less substantial than probable cause. To permit it, as in the case of a <u>Terry</u> frisk, on the lesser predicate of reasonable suspicion is a significant departure from the norm. As part of the <u>Terry v. Ohio</u> totality, however, the <u>Terry</u> frisk was deliberately designed to afford an officer an enhanced protection, to wit, a protection activated by a less rigorous predicate, but only in those special circumstances wherein a <u>Terry</u> stop has placed the officer in enhanced danger. A reasonable suspicion to believe that a crime has occurred imposes upon an officer the sometimes dangerous duty to stop a suspect and to investigate further even in hazardous surroundings. In such circumstances, the officer is permitted the additional safeguard for his own protection. The <u>Terry</u> stop and the <u>Terry</u> frisk are inseparable parts of the same package. In the <u>Terry</u> case itself, the concurring opinion of Justice Harlan made this symbiotic relationship absolutely clear.

> "[I]f the frisk is justified in order to protect the officer during an encounter with a citizen, the officer must first have constitutional grounds to insist on an encounter, to make a forcible stop. <u>Any person, including a policeman, is</u>

14

at liberty to avoid a person he considers dangerous. If and when a policeman has a right instead to disarm such a person for his own protection, he must first have a right not to avoid him but to be in his presence. That right must be more than the liberty (again, possessed by every citizen) to address questions to other persons, for ordinarily the person addressed has an equal right to ignore his interrogator and walk away; he certainly need not submit to a frisk for the questioner's protection. I would make it perfectly clear that the right to frisk in this case depends upon the reasonableness of a forcible stop to investigate a suspected crime."

392 U.S. at 32-33 (Harlan, J., concurring) (emphasis supplied).

4 Wayne R. LaFave, SEARCH AND SEIZURE (3d ed. 1996), pp. 247-49, describes the same indivisible relationship:

"[A] frisk for self-protection cannot be undertaken when the officer has unnecessarily put himself in a position of danger by not avoiding the individual in question. This means that in the absence of some legitimate basis for the officer being in immediate proximity to the person, a degree of suspicion that the person is armed which would suffice to justify a frisk if there were that basis will not alone justify such a search. For example, if a policeman sees a suspicious bulge which possibly could be a gun in the pocket of a pedestrian who is not engaged in any suspicious conduct, the officer may not approach him and conduct a frisk. And this is so even though the bulge would support a frisk had there been a prior lawful stop. Likewise, if an officer, lacking the quantum of suspicion required by Terry to make a forcible stop, instead conducts a non-seizure field interrogation, he may not frisk the person interrogated upon suspicion he is armed; in such a case the officer may protect himself by not engaging in the confrontation."

(Emphasis supplied).

In Graham v. State, 146 Md. App. at 362, this Court spoke to the same enhanced danger/enhanced protection totality:

"From the beginning in 1968, the Supreme Court made it clear that there is a necessity principle behind permitting the police to execute a frisk on a predicate less substantial than probable cause. When a police officer's duty requires that he stop and interrogate potentially dangerous individuals suspected of engaging in crime, he must be permitted, when there is reasonable suspicion of danger, to act for his own self-protection. A Terry-

15

frisk, therefore, may, frequently but not always, follow a Terry-stop. The corollary is that a reasonable Terry-stop is a condition precedent to a reasonable Terry-frisk."

(Emphasis supplied).

In this case, Officer Aungst barged impetuously on to the Beta of a Terry frisk without having gone through the Alpha of a Terry stop.[2] Constitutionally, that was a bridge too far.

## C. The Excessive Scope of the Frisk

The Terry frisk in this case was thrice bereft. Even if, arguendo, this Terry frisk had been an adjunct of a Terry stop, and even if, arguendo, there had been reasonable suspicion to believe that the appellant was armed and dangerous, the frisk would still have incurred the constitutional opprobrium of having been excessive in scope.

The permitted scope of any search (and a frisk is a junior varsity search) is whatever is necessary to serve the purpose of that particular search – but not one little bit more. What then would have been the purpose of this particular Terry frisk? In Gibbs v. State, 18 Md. App. at 241, this Court set out the purpose succinctly.

"Even after a reasonable 'stop' has been made, the governmental interest which permits the further intrusion of a limited search – a 'frisk' – of the person is not the prevention or the detection of crime, but rather the protection of the officer making the stop."

(Emphasis supplied).

---

[2] It is elementary that the Fourth Amendment recognizes no such extra-Constitutional procedure as a frisk incident to a mere accosting. This is so even if the accosting grandiosely proclaims itself to be a "field interview." See Graham v. State, 146 Md. App. at 364-68.

16

In <u>Alfred v. State</u>, 61 Md. App. at 666, we made that animating purpose very clear.

> "<u>The very raison d'être for a frisk</u>, as the frequent boon companion of the stop, <u>is the protection of the life and limb of the stopping officer</u> from the stoppee during the course of the stop."

(Emphasis supplied).

With, therefore, the exclusive purpose of the frisk being the discovery of weapons the stoppee might use to harm the stopping officer, the scope limitation on the frisk logically follows. <u>Alfred v. State</u>, 61 Md. App. at 669, articulated the self-evident limitation.

> "Under the ever-present minimization requirement of the Fourth Amendment, <u>only a pat-down of the exterior of the clothing surface is permitted</u>. The reason for this limitation is that <u>a pat-down is enough to reveal the presence of large and palpable weapons, such as guns, knives, blackjacks, and brass knuckles</u>."

(Emphasis supplied).

In <u>Anderson v. State</u>, 78 Md. App. at 477-78, we elaborated on the minimization requirement and the application of that minimization requirement to a pat-down of the clothing to detect almost all weapons.

> "There is under the Fourth Amendment <u>an ever-present requirement for the police to minimize even necessary intrusions</u>. The permitted scope of an intrusion is whatever is necessary to serve the purpose of that particular intrusion, but nothing more…. The reason the Fourth Amendment permits a policeman to conduct a minimal search (a frisk) of a suspect upon such a lesser predicate is the necessity of protecting from harm the life and limb of the stopping officer. The danger is that the stoppee may be armed. <u>Because almost all weapons</u>—guns, knives, blackjacks, brass knuckles—<u>are hard, palpable objects, their presence may be detected by a close pat-down of the exterior of the clothing surface. Because that is all that is necessary, that is all that is permitted</u>."

(Emphasis supplied).

17

The pat-down for weapons sanctioned by the Supreme Court in the Terry case itself is an exemplar of how a proper frisk should be limited in its intensity.

> "Officer McFadden patted down the outer clothing of petitioner and his two companions. He did not place his hands in their pockets or under the outer surface of their garments until he had felt weapons, and then he merely reached for and removed the guns. He never did invade Katz' person beyond the outer surfaces of his clothes, since he discovered nothing in his pat-down which might have been a weapon. Officer McFadden confined his search strictly to what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapons. He did not conduct a general exploratory search for whatever evidence of criminal activity he might find."

392 U.S. at 29-30. (Emphasis supplied).

With these austere limitations in mind, we turn to the ostensible Terry frisk in this case. As Officer Aungst performed his "open-handed pat-down of [the appellant's] outer garments," he felt nothing in the waistband but he did detect a soft "large bulge" in the appellant's left front pants pocket. We know of no theory by which a soft bulge could reasonably be interpreted to be a gun, a knife, a blackjack, or brass knuckles. There was thus no indication that a weapon was present and Officer Aungst should simply have proceeded with the pat-down until he was satisfied that the appellant had no weapons. Whatever else the appellant may have had on his person was constitutionally beside the point.[3]

---

[3] Through the appellant's clothing, the officer felt a soft but large bulge. The State, for the first time on appeal, pushes out the envelope beyond its breaking point by invoking at that early juncture the "plain feel" doctrine of Minnesota v. Dickerson, 508 U.S. 366, 113 S. Ct. 2130, 124 L.Ed.2d 334 (1993). In Dickerson, 508 U.S. at 375-76, the Supreme Court analogized the "plain feel" doctrine to the "plain view" doctrine:

18

His investigative curiosity piqued, however, Officer Aungst allowed the frisk to wander off the protective track and to slide onto the investigative track. With respect to the soft bulge, the officer asked the appellant, "What is this?" the appellant "didn't answer … at first and just simply started shaking." In effect, the appellant was being interrogated,

> "We think that this doctrine has an obvious application by analogy to cases in which an officer discovers contraband through the sense of touch during an otherwise lawful search…. If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context."

(Emphasis supplied; footnote omitted).

Just as with the plain view doctrine, warrantless seizure is only permitted if the "contour or mass" of the object that is felt "makes its identity immediately apparent" as contraband, to the probable cause level. A mere piquing of curiosity and a desire to investigate further do not suffice. Dickerson made it clear, 508 U.S. at 378, that any further "squeezing, sliding, and otherwise manipulating" of the object in order to confirm the initial suspicion is not permitted. That the further investigation here was the inquiry "What is this?" rather than a further manipulation of the bulge is inconsequential. This was not an occasion for the "plain feel" doctrine and that doctrine was never argued before the suppression hearing judge. It is a hypothetical afterthought.

The allure of the "plain feel" doctrine, moreover, far exceeds its actual utility. The limitation is that more is required than simply the legitimate feeling of an object of interest. As a Fourth Amendment trigger, the sense of touch must supply the ultimate answer and not simply give rise to an intriguing further question. Had the "plain feel" doctrine applied in the present case, Officer Aungst, upon feeling the soft large bulge, would not have needed to ask, "What is this?" He would already have known the answer through his sense of touch. There would have been no need for further examination, either by way of sliding the suspect object back and forth between the fingers or by a pair of follow-up questions to the appellant. The bulge piqued Officer Aungst's curiosity, and he did not want to let the subject go. That, however, is not a progressing scenario authorized by the "plain feel" doctrine.

19

under very coercive circumstances, about something detected on his person other than a weapon. Officer Aungst behaved as if he were thinking that, when he detected an unknown object other than a weapon, he was entitled to investigate further and/or to inquire further as to what that unknown object was. That, of course, was the crossing of the line, albeit perhaps a slight crossing, that the limitations on the <u>Terry</u> frisk were designed to prevent.

Officer Aungst then asked, "Is there anything in here that can hurt me?" The appellant replied, "Yes, I do, I have needles." Officer Aungst articulated no fear of acupuncture, but nonetheless reached into the appellant's pants and removed an opaque coin purse. That may have been the critical moment when he stepped out of bounds. The coin purse was obviously not a weapon. If necessary, a mere squeeze of the coin purse could have confirmed that there was no weapon inside it. <u>McDowell v. State</u>, 407 Md. 327, 341, 965 A.2d 877 (2009).

In his testimony as to his reaction, Officer Aungst did not express a fear about being stuck with a needle. After a <u>pro</u> <u>forma</u> mention of officer safety, the officer revealed a basis for investigative suspicion.

> "Yes. First of all, officers' safety. Needles can go through a lot of things, so I wanted to secure those items. Second of all, being that it's in a high crime area, <u>needles generally indicate the use of heroin. So, therefore, I assumed there was contraband in the [appellant]'s pocket</u>."

The officer reached into the appellant's pants pocket and pulled out what turned out to be a coin purse. The officer then opened the coin purse and pulled out a plastic bag. Investigating the plastic bag more closely, the officer found within it "a hard rock-like substance" that "resembled crack cocaine." The officer also recovered other bags, some of

them containing a white powdery substance as well as a spoon and two needles. This was the case against the appellant who was then arrested for the possession of narcotics and the possession of narcotics paraphernalia. The question is whether this <u>Terry</u> frisk went beyond the minimal pat-down of the exterior of clothing surface necessary to reassure Officer Aungst that he was not threatened by offensive weapons.

In arguing the case before the suppression hearing judge, the State seemed to be making the same leap of faith that Officer Aungst made in taking, a leap away from officer safety and into the investigation of narcotics possession.

> "He is in a high drug area. He's in the Chestnut Manor Apartments. This description, then he feels what he believes to be <u>consistent in his experience with that could be contraband coupled with the defendant's statement that I have needles</u>, I think the officer would be negligent to – [.]"

(Emphasis supplied).

The State's assumption seemed to be that once the appellant mentioned "needles," the <u>Terry</u> frisk was history and what was thereafter taking place was a criminal investigation of narcotics possession. The State's brief argued:

> "I think this is exactly the same. <u>He is admitting to committing a misdemeanor of having drug paraphernalia in his pocket</u>. It's the same as if he would have told the officer, I have a marijuana pipe in my pocket. <u>Once he admitted a misdemeanor</u>, the possession of drug paraphernalia, <u>he could have been charged solely with the needles</u>."

(Emphasis supplied).

Where the State was going on the suppression issue, however, is hard to figure. Even if it had been true, as argued by the State, that the appellant "could have been charged solely with the needles," the fact is that he was not so charged or arrested. What then

justified the rest of the search? The pulling of the coin purse from the appellant's pocket? The opening of the coin purse? The retrieval of a plastic bag? The search of the plastic bag? Those things were not the product of a search incident to a lawful arrest, for no arrest (lawful or unlawful) had been made. There was simply no justification even offered for the search that, step by step, produced these items, and they, therefore, should have been suppressed.  As the Court of Appeals explained in State v. Smith, 345 Md. 460, 465, 693 A.2d 749 (1997):

> "[T]he objective is to discover weapons readily available to a suspect that may be used against the officer, not to ferret out carefully concealed items that could not be accessed without some difficulty. General exploratory searches are not permitted, and police officers must distinguish between the need to protect themselves and the desire to uncover incriminating evidence."

(Emphasis supplied).

Although each excess may have been small, seguing almost indiscernibly into the next, the bottom line was that the appellant suffered, in its bottom line totality, what amounted to a fully intensive search-incident of his person and not an austerely limited pat-down for weapons. It is a classic example of a scope violation, with the Terry limitations being lost in the investigative bustle.[4]

---

[4] In groping for a rationale, the State, for the first time on appeal, descends deep into the subjunctive mood to come up with a hypothetical. With reference of Officer Aungst's seizure and subsequent opening and searching of the coin purse, the State's brief argues, "Although not mentioned by the officer, the search was a proper search incident to arrest." The State and this Court must be reading different transcripts. In the record of the suppression hearing (which is our entire factual universe), we find no glimmer of a suggestion of an arrest ever having been made. The notion of a search incident to arrest was never argued nor ever mentioned to the hearing judge. There is, of course, an exception to the warrant requirement for a search incident to lawful arrest. There is no such thing, on

Were all the <u>arguendos</u> satisfied along the way, this ultimate search of the appellant, under the guise of a <u>Terry</u> frisk, we would hold to have been an unreasonable scope violation of the far more limited intrusion authorized by the concern for officer safety.

## It Comes With the Territory

When half a century ago <u>Terry v. Ohio</u> was in its infancy, everyone understood that the grant of a broad new prerogative to the police and the built in limitation on the prerogative were but flip sides of the same indivisible coin. An understanding of the limitation was indispensable to a full understanding of the prerogative itself. It was the price that had to be paid for the prerogative. The limitation is not an arbitrary technicality designed to make the officer's job more difficult. It is a built-in aspect of the prerogative itself. It comes with the territory.

**JUDGMENT REVERSED; COSTS TO BE PAID BY WICOMICO COUNTY.**

---

the other hand, as a search incident to a non-arrest. Nor is there any such thing as a search incident to an imaginary arrest that might have been made but wasn't.